## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHEN ROSSINI and MATTHEW KANE, on behalf of themselves and all similarly situated individuals,<br><br>    Plaintiffs,<br><br>    v.<br><br>PNC FINANCIAL SERVICES GROUP, INC. and PNC BANK, N.A.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   2:18-cv-1370 |

## <u>OPINION</u>

**J. Nicholas Ranjan, United States District Judge**

This is a class-action lawsuit alleging that Defendants PNC Financial Services Group, Inc. and PNC Bank, N.A. (collectively, "PNC") violated the Fair Credit Reporting Act ("FCRA") and Pennsylvania Criminal History Record Information Act ("CHRIA"). Specifically, Plaintiffs contend that PNC violated the FCRA and CHRIA by failing to comply with certain statutory disclosure and notice requirements during its hiring and background check processes. PNC disputes Plaintiffs' contentions on several grounds.

Currently before the Court are Plaintiffs' unopposed motions for final approval of the parties' class-action settlement agreement [ECF 57] and for approval of Plaintiffs' counsel's requested award of attorneys' fees and costs. [ECF 59]. The Court held a final fairness hearing on April 22, 2020, during which no third-party objected to or otherwise sought to intervene in the settlement. [ECF 65; ECF 66].

After careful consideration, the Court will now grant both of Plaintiffs' motions and approve the settlement.

I.      Background

    A.      **Plaintiffs' FCRA claims against PNC.**

Plaintiffs filed this lawsuit in the Allegheny County Court of Common Pleas, Case No. GD-18-011610, on September 6, 2018. [ECF 61, ¶ 19; ECF 1-2]. Plaintiffs generally allege that PNC violated the FCRA and CHRIA by obtaining job applicants' criminal history reports or drug test results and, in some cases, rescinding job offers based on those reports. With respect to their FCRA claims, Plaintiffs contend that PNC's actions violated 15 U.S.C. § 1681b(b)(2), which they refer to as the "Stand-Alone Disclosure" requirement, and 15 U.S.C. § 1682b(b)(3), which they refer to as the "Pre-Adverse Action Disclosure" requirement.

Section 1681b(b)(2) provides that a person may not procure a "consumer report" for "employment purposes" unless a "clear and conspicuous disclosure has been made in writing to the consumer" and the consumer "has authorized in writing … the procurement of the report." 15 U.S.C. § 1681b(b)(2). Plaintiffs allege, in Counts I and II of their amended complaint, that the criminal history reports and drug test results procured by PNC were "consumer reports" and that PNC violated the statute by obtaining them for "employment purposes" without first receiving authorization from Plaintiffs. [ECF 50, ¶¶ 127-134].

Section 1681b(b)(3) provides that "before taking any adverse action based in whole or in part on [a] consumer report," the acting person must provide the consumer "a copy of the report" and "a description in writing of the rights of the consumer under this subchapter[.]" 15 U.S.C. § 1681b(b)(3). Plaintiffs allege, in Counts III and IV of their amended complaint, that the criminal history and drug test reports procured by PNC were "consumer reports," and that PNC violated the statute by rescinding certain class

2

members' employment offers based on criminal history information or drug test results without giving pre-adverse action notice.  [ECF 50, ¶¶ 135-142].

Based on these alleged violations, Plaintiffs contend that PNC is subject to liability under 15 U.S.C. § 1681n(1)(A), which provides that "[a]ny person who willfully fails to comply with any requirement imposed under this title … is liable to that consumer in an amount equal to the sum of any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000[.]"  The statute also permits recovery of "such amount of punitive damages as the court may allow" and "reasonable attorneys' fees as determined by the court."  15 U.S.C. § 1681n(2)–(3).   Thus, if Plaintiffs prevail, class members could recover statutory damages of between $100.00 and $1,000.00 for each FCRA violation, plus punitive damages if allowed by the Court and reasonable attorneys' fees.

In its answer, PNC asserts that it is not liable because, according to PNC: (1) the criminal history reports obtained on the purported class members do not constitute "consumer reports" under the FCRA (and thus the FCRA does not apply); (2) Plaintiffs' claims are not subject to class certification; (3) PNC's disclosure forms complied with the law; (4) PNC's pre-adverse action procedures complied with the law, and; (5) PNC did not act "willfully."

**B.    Discovery conducted to-date.**

The Court held an initial case management conference on December 12, 2018.  [ECF 24; ECF 25].  Subsequently, and before reaching their proposed settlement, the parties completed certain initial discovery, including:

**1.    Rule 26(a) Disclosures.**  The parties exchanged Rule 26(a)(1)(A) initial disclosures on January 18, 2019.  [ECF 53, ¶ 16].

**2.    Written Discovery & Document Production.**  Plaintiffs served requests for production of documents and interrogatories to PNC on December

27, 2018.  [*Id*.].  PNC served written responses on February 11, 2019.  [*Id*. at ¶ 19].  After the parties' agreed to a protective order, PNC served supplemental written responses to Plaintiffs' interrogatories and produced 469 pages of documents.  [*Id*. at ¶ 22].  PNC's production included documents related to Plaintiffs' job applications, as well as PNC's written policies related to employment applications, including its processes for obtaining and reviewing background information such as criminal history reports, drug test results, and credit checks.  [*Id*.].

For its part, PNC served requests for production and interrogatories to Plaintiffs on February 8, 2019.   [*Id*. at ¶ 18].  Plaintiffs responded on March 25, 2019 and produced 426 pages of documents.  [*Id*. at ¶ 21].  On April 25, 2019, Plaintiffs served supplemental responses to PNC's interrogatories and produced additional documents.  [*Id*. at ¶ 24].

**3.    Third-Party Discovery.**   On January 31, 2019, Plaintiffs subpoenaed First Advantage Background Services Corporation ("First Advantage"), the agency used by PNC to obtain FBI criminal history reports and drug test results.  [*Id*. at ¶ 18].  First Advantage produced documents in response to that subpoena on April 18, 2019.  [*Id*.].

**C.    State court proceedings in *McCoy, et al. v. PNC Financial Services Group, Inc.* and Plaintiffs' CHRIA claims.**

On January 26, 2018, an individual named Damien McCoy—who is also represented by Plaintiffs' counsel—filed a factually related putative class action in the Allegheny County Court of Common Pleas, Case No. GD-18-001378, alleging that PNC violated the Pennsylvania CHRIA.  [ECF 61, ¶ 20].  Specifically, Mr. McCoy alleged that PNC's background check policies violated 18 Pa. C.S. § 9125(b), which provides that "[w]henever an employer is in receipt of information which is part of an employment applicant's criminal history

record information file … [f]elony and misdemeanor convictions may be considered by the employer only to the extent to which they relate to the applicant's suitability for employment…"

PNC removed the *McCoy* lawsuit to federal court, but it was later remanded. [ECF 52, pp. 5-6]. Following remand, PNC responded to the *McCoy* complaint by filing preliminary objections arguing, among other things, that the *McCoy* plaintiffs had failed to name a necessary party. [*Id.* at p. 6]. The state court sustained PNC's objections and dismissed the case without prejudice. [*Id.*] As of this date, *McCoy* has not been re-filed. [*Id.*].

### D. The parties' settlement negotiations and mediation.

The parties attended mediation with Rodney Max on April 29, 2019. [ECF 37; ECF 61, ¶ 33]. During the mediation, the parties sought to resolve both the *Rossini* and *McCoy* claims. [ECF 61, ¶ 33]. They made progress during their first mediation session but did not reach an agreement and continued to negotiate. [*Id.* at ¶ 34]. The parties then held a second mediation with Mr. Max on May 8, 2019. [*Id.* at ¶ 35]. During that session, they reached a settlement-in-principle to resolve *Rossini*. [*Id.*]. Part of that agreement required Plaintiffs to amend the *Rossini* complaint to include the CHRIA class claims asserted in *McCoy*. [ECF 52, p. 7; ECF 53, ¶ 28]. The claims of the individual plaintiffs in *McCoy* were settled separately. [ECF 52, p. 19].

On October 29, 2019, in accordance with the parties' settlement agreement, Plaintiffs filed their first amended complaint in *Rossini* to add claims under the CHRIA. [ECF 50]. The CHRIA permits a plaintiff to recover "actual and real damages of not less than $100 for each violation" and "[e]xemplary and punitive damages of not less than $1,000 nor more than $10,000" for "any violation … found to be willful." 18 Pa. C.S. § 9183.

### E.    The parties' settlement agreement

The settlement agreement [ECF 51-1] reached by the parties consists primarily of the following material terms:

**1.    PNC's Practice Changes; Limitation of Class Scope.** PNC represented that it altered its relevant background check and other FCRA-related policies effective June 2, 2019.  [*Id.* at p. 2].  Relevant portions of the settlement agreement—specifically, the date for membership in the settlement classes and the scope of the release that will bind class members who have not opted out—are time-limited accordingly (*i.e.*, limited to between September 6, 2016 until June 2, 2019).

**2.    Payments from Common Fund.**  The parties' settlement agreement provides members of four proposed settlement classes the opportunity to receive payments from a $626,960.00 settlement fund as follows:

**a.    *FCRA "Rescinded" Settlement Class.***  The proposed FCRA "Rescinded" class includes all individuals who applied for employment with PNC during the relevant time period and received offers of employment that PNC then rescinded based on the applicants' criminal history reports or drug test results.  The proposed settlement would allocate **$189,760.00** to members of the class, which will be paid automatically, by check, on a *pro rata* basis to all class members who do not opt out.  [*Id.* at § 7.1.1].  The parties believe that there are **1733** individuals in this class who will each receive a payment of at least **$109.49**. [ECF 58, p. 14].

**b.    *FCRA "Decisional" Settlement Class.*** The proposed FCRA "Decisional" class includes all individuals who applied for employment with PNC during the relevant time period whose criminal history reports were coded "Decisional" by First Advantage, but whose job offers PNC did not

rescind as a result.    The proposed settlement allocates **$217,200.00** to members of the class, which will be paid automatically, by check, on a *pro rata* basis to all class members who do not opt out. [ECF 51-1, § 7.1.1]. The parties believe that there are **3742** individuals in this class, who will each receive a payment of at least **$58.04**. [ECF 58, p. 14].

   **c.** ***FCRA "Claims Made" Settlement Class.*** The proposed FCRA "Claims Made" class is divided into two sub-groups. The FCRA "Disclosure" sub-group consists of all individuals who applied for employment with PNC during the relevant time period and received an FCRA authorization and disclosure form only in PNC's online employment application (but excluding individuals "subject to a credit history report following a conditional offer of employment"). The FCRA "Drug Test" sub-group consists of all individuals who applied for employment with PNC and "had a drug test that was initially marked anything other than 'Negative' or 'Negative Dilute,' but who did not have an offer of employment rescinded." The proposed settlement allocates **$170,000.00** to members of this class, which will be paid on a *pro rata* basis to all class members who (1) do not opt out and (2) timely submit a claim form. [ECF 51-1, § 7.1.1]. The parties believe that there are **23,450** individuals in this class, who will each receive at least **$7.25**. [ECF 58, pp. 13-14].

   **d.** ***The CHRIA Settlement Class.*** The proposed class includes all individuals residing in Pennsylvania who applied for employment with PNC during the relevant period and received offers of employment that PNC then rescinded based on a criminal history report that did not reflect a conviction, such as reports reflecting arrests, dropped charges, or pretrial diversion. The proposed settlement allocates **$30,000.00** to members of this class, which will be paid on a *pro rata* basis to all class members who (1) do not opt out and also (2) timely submit a claim form. [ECF 51-1, § 7.1.1]. The

parties believe that there are **394** individuals in this class, who will each receive a payment of at least **$76.14**.  [ECF 58, p. 13].

       **3.**      **Incentive Awards.** PNC agreed to pay $10,000.00 to each of the two named Plaintiffs as an incentive award.  [ECF 51-1, § 7.1.1].

       **4.**      **Notice and Administration of Settlement.** PNC agreed to pay all notice and administration expenses.  [*Id.* at § 8.1].  The designated settlement administrator, Rust Consulting, Inc., is responsible for (1) providing notice to class members by U.S. Mail; (2) establishing and maintaining the internet website containing information about the settlement; (3) establishing and staffing a toll-free telephone number to answer questions from settlement class members; (4) handling opt-out requests from members of all settlement classes; (5) handling claims submitted by members of the FCRA "Disclosure" and CHRIA settlement classes; and (6) making payments to settlement class members.  *See generally* [*Id.* at §§ 4.2, 5].

       **5.**      **Attorneys' Fees and Costs.**  PNC agreed to not oppose Plaintiffs' request for attorneys' fees and costs, not to exceed $300,000.00.  [*Id.* at § 9.1.1].  Both parties agreed that the payment of attorneys' fees would not diminish the fund available to class members, and that the settlement would not depend on the Court's approval of any fee award.  [*Id.* at § 9.1.2]

       **6.**      **Liability Release.**  The parties agreed that settlement class members who do not timely opt-out will release all claims under the FCRA, CHRIA, and any "other state statutory or common law equivalent" that relate in any way to the settlement class members' candidacy or application for employment with PNC between September 6, 2016 and June 2, 2019.  [*Id.* at § 10.1].

F.    **Preliminary Approval and Class Notice.**

On October 29, 2019, Plaintiffs filed an unopposed motion for preliminary approval of the parties' settlement agreement. [ECF 51]. The Court conditionally certified Plaintiffs' proposed settlement classes, granted preliminary approval of the settlement, and approved the proposed notice to class members on January 9, 2019. [ECF 54].

1.    **Notice Under the Class Action Fairness Act of 2005.** On November 8, 2019, the settlement administrator mailed the notice required by the Class Action Fairness Act of 2005 ("CAFA") to the United States Attorney General, the regional and national offices of the Office of the Comptroller of Currency, and the Federal Reserve Bank of Cleveland. [ECF 56-1, ¶ 20]. The CAFA Notice provided a link to a website (www.cafanotices.com) for Federal officials to review the relevant documents associated with the settlement. [*Id.* at ¶ 21].

2.    **Mail Notice.** On February 10, 2020, the settlement administrator mailed 29,318 copies of the notice and claims forms approved by the Court to all settlement class members. [*Id.* at ¶ 7]. Of those, 154 notices were returned undeliverable with a forwarding address, while 3,319 notices were returned *without* a forwarding address. [*Id.* at ¶¶ 8, 9]. The undelivered notices with a forwarding address were re-mailed on March 11, 2020. [*Id.* at ¶ 9]. For those without a forwarding address, the settlement administrator performed a skip trace database search through TransUnion to obtain addresses for those class members. [*Id.*]. The administrator received 2,623 "hits" on that search, and re-mailed notice to each of those addresses on March 11, 2020. [*Id.*]. Of the 2,777 notices that were re-mailed, only 172 were returned as undeliverable a second time. [*Id.* at ¶ 10]. Thus, at the end of the

day, only 696 settlement class members—approximately 2% of the total class—did not receive notice.

        **3.**      **Settlement Website.**  On the same day initial notice was mailed, February 10, 2020, the settlement administrator also launched a website, informationreportingsettlement.com, where information and documents relevant to the settlement can be accessed.  [*Id.* at ¶¶ 13-16].  These include the mail notice and claim form, the parties' settlement agreement, and several of the filings in this lawsuit.  [*Id.*].  The settlement administrator reported 2,597 unique visitors to the settlement website as of March 29, 2020.  [*Id.* at ¶ 16].

        **4.**      **Telephone Support.** The settlement administrator also established a toll-free telephone support line for potential class members to call with questions or requests for pertinent information.  [*Id.* at ¶ 11].  The support line telephone number was listed in the mailed notices and on the settlement website.  [*Id.*].  The telephone support line allows potential class members to hear pre-recorded answers to frequently asked questions regarding the settlement.  [*Id.*].  As of March 29, 2020, the settlement administrator reported that there had been 523 calls to the telephone support line.  [*Id.* at ¶ 12].

        **5.**      **Claims Forms, Opt-Outs, and Objections.**  As of March 29, 2020, the settlement administrator had received timely claims forms from 956 members of the "claims-made" class and 148 timely opt-out requests from potential class members.  [*Id.* at ¶¶ 17-18].  No class member has objected to the settlement.  [*Id.* at ¶ 19].

      **G.**    **Motions for Final Approval and Final Fairness Hearing.**

On April 8, 2020, Plaintiffs filed unopposed motions seeking final approval of the parties' settlement agreement and approval of attorneys' fees

and costs.  [ECF 57; ECF 59].  Plaintiffs also filed declarations regarding the completion of class notice [ECF 56], and in support of their motions for settlement approval.  [ECF 59].  Two weeks later, on April 22, 2020, the Court held a final fairness hearing.  [ECF 65; ECF 66].  No class member objected to the settlement either before, during, or after the fairness hearing.

## DISCUSSION & ANALYSIS

"A court presented with a joint request for approval of a class certification and settlement must separate its analysis of the class certification from its determination that the settlement is fair." *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 410 (E.D. Pa. 2010) (cleaned up).  At the certification stage, the Court must ensure that the proposed settlement classes "satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, as well as the relevant 23(b) requirements[.]" *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 778 (3d Cir. 1995).  Once the Court has certified a settlement class, it must then review the settlement agreement to determine whether it is "fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e)(2).  This determination is made after a "formal fairness hearing where class members may object to the settlement." *In re NFL Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 713 (E.D. Pa. 2014) (citation omitted).

Here, the Court has carefully considered the entire record, including the parties' briefing, the declarations submitted in support of Plaintiffs' motions, and the parties' presentation at the Final Fairness Hearing.  For the following reasons, the Court will certify the proposed settlement classes, approve the settlement agreement, and award Plaintiffs' counsel their requested fees.

## I.   The proposed settlement classes satisfy the requirements of Rule 23 class certification.

As a threshold matter, the settlement classes identified by Plaintiffs satisfy the Rule 23(a) requirements of "numerosity, commonality, typicality, and adequacy of representation" as well as "the relevant 23(b) requirements," which, in this case, are those found in Rule 23(b)(3). *In re Gen. Motors Corp.*, 55 F.3d at 778.

### A.   The requirements of Rule 23(a) are satisfied.

#### i.   Rule 23(a)(1)'s "numerosity" requirement is satisfied.

Rule 23(a)(1) requires that a purported class be "so numerous that joinder of all members is impracticable." Fed R. Civ. P. 23(a)(1). While no minimum number of plaintiffs is required, "a plaintiff in this circuit can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing that the potential number of plaintiffs exceeds 40." *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (cleaned up).

Here, the parties have identified 23,450 FCRA "Claims Made" class members, 3,742 FCRA "Decisional" class members, 1,733 FCRA "Rescinded" class members, and 393 CHRIA class members, for a total of 29,318 members across all settlement classes. These classes satisfy the "numerosity" requirement, both individually and collectively.

#### ii.   Rule 23(a)(2)'s "commonality" requirement is satisfied.

Rule 23(a)(2) requires that class members "share at least one question of fact or law in common with each other." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018) (cleaned up); Fed. R. Civ. P. 23(a)(2) ("[T]here are questions of law or fact common to the class."). "A complaint's mere recital of questions that happen to be shared by class members is not sufficient to obtain class certification." *Mielo*, 897 F.3d at 487 (cleaned up). "Rather, commonality

requires the plaintiff to demonstrate that the class members have suffered the same injury." *Id.* (cleaned up). Put differently, the focus is "whether the defendant's conduct was common as to all of the class members." *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) (cleaned up).

Here, Plaintiffs identify the following common questions at-issue for each settlement class:

**1.    The FCRA "Rescinded" Settlement Class:** Did PNC's practice of failing to provide a pre-adverse action notice to job applicants before rescinding their job offers based on criminal history reports or drug test results violate the "Pre-Adverse Action Disclosure" requirement of 15 U.S.C. § 1681b(b)(3)?

**2.    The FCRA "Decisional" Settlement Class:** Did PNC's practice of failing to provide pre-adverse action notice to job applicants whose criminal history reports were coded "Decisional" by First Advantage violate "Pre-Adverse Action Disclosure" requirements of 15 U.S.C. § 1681b(b)(3)?

**3.    The FCRA "Claims Made" Settlement Class:**

**a.    The FCRA "Disclosure" Group:** Did the authorization and disclosure in PNC's online employment application violate the "Stand-Alone Disclosure" requirements of 15 U.S.C. § 1681b(b)(2)?

**b.    The FCRA "Drug Test" Group:** Did PNC's practice of failing to provide a pre-adverse action notice to job applicants when drug tests were marked anything other than "Negative" or "Negative Dilute" violate the "Pre-Adverse Action Disclosure" requirements of 15 U.S.C. § 1681b(b)(3)?

**4.    The CHRIA Settlement Class:** Did PNC's practice of rescinding job offers based on criminal history reports, where the report did not reflect a conviction, violate 18 Pa. C.S. § 9125(b)?

Based on these common questions of law, the proposed classes satisfy the "commonality" requirement.  Each class presents a common question of law that arises from the same conduct directed toward similarly situated individuals.  PNC's primary defense to each class of claims also presents a common question of law—do the criminal history reports and drug test results that underlie Plaintiffs' claims constitute "consumer reports" under the FCRA?

Additionally, evidence to resolve the legal questions at issue for each class would primarily entail proof common to all Plaintiffs regarding (1) PNC's hiring processes; (2) the timing of PNC's procurement of the alleged "consumer reports" within its hiring process; (3) the meaning of various codes (*i.e.*, "Decisional") assigned to the alleged "consumer reports" by PNC's background check contractor, First Advantage; (4) PNC's policies related to giving pre-adverse action notice; and (5) PNC's policies related to the use of the alleged "consumer reports" in its hiring decisions.

These common issues of law and proof would establish (or refute) the essential elements of Plaintiffs' claims and thus easily predominate over any unique issues that could foreseeably arise in the cases of individual claimants. PNC does not appear to dispute that its alleged conduct with respect to each class of claimants resulted from the application of uniform policies—its defense was only that those policies were lawful.  And courts are reluctant "to disallow class action treatment on the basis of individualized liability issues where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability." *Reardon v. ClosetMaid Corp.*, No. 08-1730, 2013 WL 6231606, at *18 (W.D. Pa. Dec. 2, 2013) (Hornak, J.) (cleaned up).

Other district courts have held that the commonality requirement is satisfied in similar FCRA cases. *See, e.g. Reardon v. ClosetMaid Corp.*, No. 08-1730, 2011 WL 1628041, at *1 (W.D. Pa. Apr. 27, 2011) (Lancaster, J.) (finding commonality in class action alleging "practice of disqualifying applicants for employment on the basis of consumer reports in violation of the FCRA."); *Doe v. Trinity Logistics, Inc.*, No. 17-53, 2018 WL 1610514, at *7 (D. Del. Apr. 3, 2018) (finding commonality in class action alleging FCRA violations in use of "employment-purposed consumer reports" and "criminal information contained in the consumer reports" to make employment decisions); *Branch v. Gov't Emps. Ins. Co.*, 323 F.R.D. 539, 546 (E.D. Va. 2018) ("The Court has consistently held that, by itself, the question of whether a defendant's actions violated Section 1681b(b)(3)(A) satisfies the commonality requirement.").

As a result, the Court finds that each of the proposed settlement classes presents a common question of law, and common issues of proof, sufficient to satisfy Rule 23(a)(2).

### iii.   Rule 23(a)(3)'s "typicality" requirement is satisfied.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).   This requirement "ensur[es] that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009) (citations omitted) (emphasis in original).

This "typicality" requirement encompasses "three distinct, though related, concerns." *Id.* at 599.  First, "the claims of the class representative

15

must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory[.]" *Id.* Second, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation[.]" *Id.* Finally, "the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* To satisfy typicality, "[t]he similarity between claims or defenses of the representative and those of the class does not have to be perfect." *Id.* at 598 (citations omitted). Instead, "the named plaintiffs' claims must merely be typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Id.* (cleaned up).

Here, the named plaintiffs, Stephen Rossini and Matthew Kane, applied for and were offered jobs with PNC that were then rescinded based on criminal history reports, allegedly without adequate pre-adverse action notice. At a minimum, then, their claims are identical to those of individuals in the FCRA "Rescinded" class.

But Rossini and Kane's injuries also encompass, and are substantially similar to, the lesser injuries of the individuals in the other classes. Those classes consist of job applicants subjected to the same PNC policies who did not suffer the *further* harm of having a job offer rescinded. In other words, Rossini and Kane had their job offers rescinded and *also* suffered substantially the same lesser harms suffered by all other class members (*e.g.*, not receiving pre-adverse action notice). As a result, not only are Rossini's and Kane's incentives to prosecute their own claims "aligned with" those of individuals in all proposed classes, they are among those with the strongest incentive to litigate—individuals who received job offers that PNC actually rescinded as a result of its allegedly unlawful practices.

Finally, the parties have not identified, and the Court cannot foresee, any unique defense that would bar Rossini and Kane's claims but not the claims of all or most other class members.

### iv. Rule 23(a)(4)'s "adequacy" requirement is satisfied.

The final Rule 23(a) class certification prerequisite requires that "the representative parties will fairly and adequately protect the interests of the class." *In re Schering Plough Corp.*, 589 F.3d at 601; Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry has two components designed to ensure that absentees' interests are fully pursued." *Id.* at 601–02 (cleaned up). "First, the adequacy inquiry tests the qualifications of the counsel to represent the class." *Id.* at 602 (cleaned up). Second, "the adequacy inquiry seeks to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* (cleaned up). Notably, "[b]ecause of the similarity of the typicality and adequacy inquiries, certain questions—like whether a unique defense should defeat class certification—are relevant under both." *Id.* (citation omitted).

**1. Qualifications of counsel.** Plaintiffs' counsel are experienced class litigators who have served as lead counsel in many class-action lawsuits, including FCRA class actions. *See, e.g.*, *Campos v. ChoicePoint Servs., Inc.*, 237 F.R.D. 478 (N.D. Ga. 2006); *Gillespie v. Equifax*, 484 F.3d 938 (7th Cir. 2007); *Reardon*, 2011 WL 1628041. Here, the quality of counsel's briefing, their successful coordination of the class notice process, and their compliance with the Court's scheduling orders have given no reason to question their competence. Thus, counsel's qualifications to represent the settlement classes are not in doubt.

**2. Conflicts of interest between named plaintiffs and the class.** "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc.*

17

*v. Windsor*, 521 U.S. 591, 625–26 (1997) (cleaned up).   This requirement overlaps significantly with the "typicality" inquiry, and, as discussed in that context above, there are no apparent conflicts between the named plaintiffs and the settlement classes they seek to represent.   To the contrary, the named plaintiffs are among the class of individuals who suffered the most significant harm (rescission of a job offer) and thus have the strongest incentive to either litigate this case aggressively or settle it for maximum value.

One potential conflict that could be a concern in a case like this (*i.e.*, a case with multiple settlement classes) is that the named plaintiffs could be willing to allocate settlement funds disproportionately to the "Rescinded" class (of which the named plaintiffs are members) at the expense of others.   But, here, the named Plaintiffs are also members of the "lesser" settlement classes, and thus would benefit from any payment to those classes as well.   More importantly, the proposed distribution of funds agreed to by the parties does not suggest that the settlement was skewed to disproportionately favor the named plaintiffs, or, for that matter, any one settlement class over the others.

Instead, as between the four settlement classes, the parties' proposed allocation of funds appears to reasonably reflect the value of each class's actual injury.   Those whose employment offers were not rescinded are slated to receive around 50% less than those whose offers were rescinded after having a criminal history report marked "Decisional."   And the most nominal payouts are reserved for those who experienced only the most nominal violations of their alleged rights.   This arrangement makes perfect sense.   Furthermore, within each settlement class, distribution of settlement funds is on a *pro rata* basis.   Thus, the settlement also does not discriminate against individual class members or subsets of class members.

Finally, Plaintiffs' proposed $10,000.00 incentive awards to the named plaintiffs are reasonable, given the assistance they rendered to their counsel, and in line with those awarded in other class-action lawsuits. *See, e.g.*, *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 259 (D.N.J. 2005) ("Their request for a $10,000 incentive award is reasonable[.]"); *In re Residential Doors Antitrust Litig.*, No. 94-3744, 1998 WL 151804, at *11 (E.D. Pa. Apr. 2, 1998) (approving $10,000.00 incentive award); *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *19 (E.D. Pa. June 2, 2004) (approving $25,000.00 incentive award).

Given these considerations, the Court finds that both prongs of Rule 23(a)(4)'s "adequacy" inquiry are satisfied as to each settlement class.

**B.      The requirements of Rule 23(b)(3) are satisfied.**

Besides the Rule 23(a) requirements discussed above, a purported class action must also satisfy a subsection of Rule 23(b). *See* Fed. R. Civ. P. 23(b). Plaintiffs suggest that this case is certifiable under Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Along with the "predominance" and "superiority" requirements found in the text of this rule, "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citation omitted).

**i.      The "predominance" requirement is satisfied.**

"Rule 23(b)'s predominance requirement incorporates Rule 23(a)'s commonality requirement because the former, although similar, is far more demanding than the latter." *Reinig*, 912 F.3d at 127 (cleaned up). "To assess

whether predominance is met at the class certification stage, a district court must determine whether the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members." *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) (cleaned up).

"If proof of the essential elements of the claim requires individual treatment, then class certification is unsuitable." *Reinig*, 912 F.3d at 128 (cleaned up). On the other hand, "[p]redominance is normally satisfied when plaintiffs have alleged a common course of conduct on the part of the defendant." *Esslinger v. HSBC Bank Nevada, N.A.*, No. 10-3213, 2012 WL 5866074, at *5 (E.D. Pa. Nov. 20, 2012) (cleaned up).

Here, Plaintiffs have alleged a common course of conduct by PNC—namely, the application of uniform policies related to the use of criminal history reports and drug test results when making hiring decisions. It is thus unlikely that there will be significant differences between individual claimants' cases, other than those that the distinct settlement classes account for. As a result, within each class, "liability depends on the conduct of [PNC]," and not "the conduct of individual class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (citation omitted). The "predominance" prong of Rule 23(b)(3) is satisfied.

## ii. The "superiority" requirement is satisfied.

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those alternative available methods of adjudication." *In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, No. 09-2034, 2018 WL 4252463, at *11 (E.D. Pa. Sept. 5, 2018) (cleaned up). The district court must consider "the class members' interests in individually controlling litigation, the extent and nature

of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 435 (3d Cir. 2016) (citation omitted).

The superiority requirement is satisfied here. If this case proceeds as a class action, thousands of individuals will have the opportunity to obtain some redress for claims that would likely not be viable as standalone lawsuits because of the small amount of damages (and novel legal theory) at issue. *See In re Warfarin*, 391 F.3d at 534 ("[I]ndividual consumer class members have little interest in individually controlling the prosecution or defense of separate actions, because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit.") (cleaned up); *Windsor*, 521 U.S. at 617 ("While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.") (cleaned up).

What's more, even if certain members of the settlement classes might have viable, standalone claims (which is unclear), those class members were given a fair opportunity to preserve their individual rights by opting out of the settlement classes. *See In re Warfarin*, 391 F.3d at 534 ("[T]his is less true for TPP members of the class, some of whom have significant individual claims. However, the TPPs had the option to opt-out of the proposed settlement if it was in their interest to bring their claims separately."). As noted above, notices were successfully delivered to at least 98% of class members, and substantial effort was expended to deliver notice to all of them. Despite this, only 148 individuals ultimately elected to opt-out of the settlement.

Under these circumstances, a class action is the superior mechanism to protect Plaintiffs' asserted rights, because it "facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement" of the FCRA. *Id.*

### iii.    The "ascertainability" requirement is satisfied.

Finally, the proposed settlement classes must satisfy the "ascertainability" requirement of Rule 23(b)(3)—a requirement not drawn from the explicit text of the Rule but, rather, "grounded in the nature of the class-action device itself." *Byrd,* 784 F.3d at 162. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 163 (cleaned up). This "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that class members can be identified." *Id.* (cleaned up).

Here, ascertainability is easily satisfied, because the parties have, in fact, identified all or substantially all members of the proposed settlement classes using PNC's business records. Even better, they successfully delivered notice to at least 98% of them. Thus, not only are the proposed settlement classes ascertainable—they have been ascertained.

For all these reasons, the Court finds that the requirements of Rule 23(b)(3) are satisfied. And because the settlement classes satisfy both Rule 23(a) and Rule 23(b), the Court finds that certification is appropriate for purposes of settling this case on a classwide basis.

## II.    The settlement agreement is "fair, reasonable, and adequate."

Having certified the settlement classes, the Court next turns to Fed. R. Civ. P. 23(e), which provides that the settlement of a certified class action requires court approval.  Before giving approval, the Court must determine that the parties' proposed settlement agreement is "fair, reasonable, and adequate" to protect the interests of class members.  Fed. R. Civ. P. 23(e). "Where, as here, the parties seek simultaneous class certification and settlement approval, courts should be even more scrupulous than usual when they examine the fairness of the proposed settlement." *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 322 (3d Cir. 2019) (cleaned up).

That said, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Gen. Motors Corp.*, 55 F.3d at 784 (citations omitted).  Thus, courts "apply an initial presumption of fairness in reviewing a class settlement when: (1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.*" In re NFL*, 821 F.3d at 436 (cleaned up).

In assessing the fairness of a settlement, the Court is guided primarily by the factors propounded by the Third Circuit in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).  The Court is required to "make findings as to each of the nine *Girsh* factors in order to approve a settlement as fair, reasonable, and adequate[.]" *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 06-1833, 2020 WL 1922902, at *15 (E.D. Pa. Apr. 21, 2020) (cleaned up).  Those factors are (1) the complexity, expense, and likely duration of litigation; (2) the reaction of the class to the settlement; (3) the stage of proceedings and amount of discovery

completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risk of maintaining the class through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of the attendant risks of litigation. *See Girsh*, 521 F.2d at 157.

Separately, in *In re Prudential Insurance Company America Sales Practice Litigation Agent Actions*, 148 F.3d 283 (3d Cir. 1999), the Third Circuit noted that, where relevant, "it may be useful to expand the traditional *Girsh* factors" to consider matters such as (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions; (2) the development of scientific knowledge; (3) the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; (4) the existence and probable outcome of claims by other classes and subclasses; (5) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved— for other claimants; (6) whether class or subclass members are accorded the right to opt out of the settlement; (7) whether any provisions for attorneys' fees are reasonable; and (8) whether the procedure for processing individual claims under the settlement is fair and reasonable. *Id.* at 323. Unlike the *Girsh* factors, which the Court must always make specific findings regarding, the *Prudential* factors are merely "illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." *In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).

Ultimately, "the decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court" and entitled to "great deference." *Vista Healthplan, Inc.*, 2020 WL 1922902, at *16 (cleaned up).

### A.    The presumption of fairness applies.

As a preliminary matter, the Court begins its analysis of the settlement agreement with an "initial presumption of fairness" for the following reasons. *In re NFL*, 821 F.3d at 436.

**1.    Arm's-length negotiations.** The parties' negotiations occurred at arm's length. *Id.* Specifically, the settlement was negotiated through mediation, and subsequent discussions, facilitated by a third-party neutral. As this Court has repeatedly observed, the "negotiation of a settlement through mediation suggests reasonableness and neutrality, not incompetence or self-dealing." *Tamasy v. Yough Sch. Dist.*, No. 18-1236, 2019 WL 5864893, at *2 (W.D. Pa. Nov. 8, 2019) (Ranjan, J.) (cleaned up); *see also Kapolka v. Anchor Drilling Fluids USA, LLC, et al.*, No. 18-1007, 2019 WL 5394751, at *6 (W.D. Pa. Oct. 22, 2019) (Ranjan, J.) (same).

**2.    Sufficient discovery.** The parties engaged in enough discovery prior to settlement to inform their negotiations. *See In re NFL*, 821 F.3d at 436. This included exchanging initial disclosures, discovery requests, and document productions. The parties do not seem to have done a large *quantity* of discovery—no depositions were conducted and only a few hundred pages of documents were ultimately exchanged. But the Court is more concerned with the *quality* of discovery exchanged, and here the critical information was simple—PNC's applicable policies, Plaintiffs' employment-application documents, and the third-party discovery obtained from PNC's background-check contractor, First Advantage.

The third-party discovery was particularly significant, because it included confirmation that First Advantage believed itself to act as a mere "channeler" of FBI background-check information, rather than a "consumer reporting agency" in its own right.  [ECF 66, pp. 13:8-14:9 ("They did take the position that essentially they were performing a channeling function and what really was sort of the dispute here as far as the FCRA claim.")].  Knowledge of First Advantage's position was necessary to inform the parties' settlement negotiations, as the viability of Plaintiffs' claims was likely to hinge on whether First Advantage was acting as a "consumer reporting agency" and, relatedly, whether the background reports furnished by First Advantage constituted "consumer reports" within the meaning of the FCRA.  *Cf. Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 107 (2d Cir. 2019) (concluding that Thompson Reuters was not acting as a "consumer reporting agency" by furnishing criminal background information); *Mix v. JPMorgan Chase Bank, NA*, No. 15-01102, 2016 WL 5850362, at *4 (D. Ariz. Oct. 6, 2016) (holding that third-party background check contractor was not a "consumer reporting agency" but, instead, an "FBI-authorized 'channeler' of data that merely transmits unadulterated information it obtains from the FBI[.]") (cleaned up); *Martin v. First Advantage Background Servs. Corp.*, No. 11-3357, 2014 WL 1260392, at *6 (D. Minn. Mar. 26, 2014) (holding that criminal background report furnished by First Advantage was not a "consumer report" within meaning of the FCRA based on statutory exception); *but see Manuel v. Wells Fargo Bank, Nat. Ass'n,* 123 F. Supp. 3d 810, 826 (E.D. Va. 2015) (concluding that criminal background check conducted by Wells Fargo was a "consumer report" under the FCRA).

Collectively, the discovery conducted by the parties was enough to support a presumption that the parties' settlement was negotiated with

adequate information in hand. The Court is also mindful that, at a certain point, there is a tension between the amount of discovery and the parties' ability to settle. That is, as discovery becomes more costly, settlement can become less likely because the higher costs escalate the settlement value and the parties become entrenched in the battlefield of litigation. The goal is to find the sweet spot—a point where the parties have the key information they need to settle in a cost-effective way, without undermining their incentive to settle early. As a result, this factor does not, and should not, require the parties to complete exhaustive or extensive discovery before settlement, so long as they have exchanged enough critical information related to the strengths and weaknesses of the claims and defenses. The parties have done so.

**3.   Experienced counsel.**   The "proponents" of the settlement—most significantly, Plaintiffs' counsel—are also experienced in similar litigation. As noted above, counsel are experienced class litigators who have served as lead counsel in many class-action lawsuits, including other FCRA class actions. *See, e.g. Campos*, 237 F.R.D. 478; *Gillespie*, 484 F.3d 938; *Reardon*, 2011 WL 1628041, at *1. This generally supports a presumption that counsel knew what they were doing when negotiating the settlement.

**4.   Small fraction of objections.**   Finally, although notice was successfully provided to at least 98% of all class members, there have been *no* objections to the settlement and only 148 opt-out requests. Given that the classes collectively include almost 30,000 members, the lack of any objection or substantial number of opt-out requests further supports a presumption of fairness and reasonableness in this case.

For these reasons, the Court finds that the "initial presumption of fairness" should apply. With that backdrop, the Court will now apply the *Girsh* factors to evaluate the parties' settlement.

**B.      The *Girsh* factors favor approval of the settlement.**

**1.      Complexity, Expense, and Likely Duration.**  The first *Girsh* factor asks the Court to evaluate the complexity, expense, and likely duration of litigation.  "Generally, cases requiring great expenditures of time, money, and other resources on behalf of the parties and the court are good candidates for settlement."  *Kapolka*, 2019 WL 5394751, at *4 (cleaned up).  Thus, "the greater the apparent complexity and likely expense associated with litigating a case to its conclusion, the more likely it is that the Court will find a proposed settlement to be fair to [the parties] and the public."  *Id.* (citation omitted).

This case remains far from trial ready.  Indeed, while the case is not particularly complex as class-actions go, no depositions have been conducted and what remains of discovery could be "even more prolonged than usual given the ongoing public health crisis related to COVID-19."  *Horton v. Right Turn Supply, LLC*, ___ F. Supp. 3d ___, No. 19-1271, 2020 WL 1952678, at *4 (W.D. Pa. Apr. 23, 2020) (Ranjan, J.).   Moreover, once discovery is complete, "the parties still have motions for class certification, motions for summary judgment, and pre-trial motions to look forward to before this case reaches trial."  *Id.*  Even if pushed forward aggressively, it is unlikely this case could be tried before the middle of next year, and probably longer than that.

Thus, because settlement of this case now would conserve substantial time, expense, and judicial resources for all involved, the Court finds that the first *Girsh* factor favors approving the parties' agreement.

**2.      Reaction of Class to Settlement.**  The second *Girsh* factor asks whether any members of the certified classes have objected or otherwise reacted to the proposed settlement.  As discussed, no objections have been filed

to the settlement, whether timely or otherwise.  Furthermore, only 148 class members have opted out despite a stellar notice-delivery rate of 98%.

One issue does warrant some attention here: the 4% claim rate (956 of 23,450) among members of the "Claims Made" class—the only class required to affirmatively submit claims forms in order to receive payment.  At first glance, that response rate seems low.  Ultimately, however, the Court does not find this to be indicative of a negative reaction by the classes overall.  To begin with, opt-outs provide the more relevant data point here, as the lion's share of the settlement will be paid automatically, including to members of the "Claims Made" class who are also members of other settlement classes.  It is also a fair inference that many members of the Claims Made class had other reasons for not filing claims—such as the comparatively insignificant injuries suffered by those class members or the fact that, in many cases, members of that class are still employed by PNC and may have been wary of, or uninterested in, filing a claim against their current employer.  Notably, only one person opted out of the FCRA "Rescinded" class, which encompasses the individuals who suffered the most tangible harm as a result of PNC's policies (rescission of a job offer).

On balance, then, the Court finds that the reaction of the class was very positive, and that this factor weighs heavily in favor of settlement approval.

      **3.   Stage of Proceedings & Amount of Discovery.**  The third *Girsh* factor requires the Court to examine the stage of proceedings and amount of discovery completed, in order to determine whether the parties had an "adequate appreciation of the merits of the case before negotiating." *In re Prudential Ins. Co.*, 148 F.3d at 319 (cleaned up).   The aim is to ensure that there is "no risk that self-interested counsel is seeking a resolution of the claims on terms that are most beneficial to counsel alone without regard for the interests of the parties." *Kapolka*, 2019 WL 5394751, at *5 (cleaned up).

Here, as discussed above, the parties conducted sufficient discovery related to PNC's relevant policies and Plaintiffs' job applications, as well as key third-party discovery related to PNC's background-check contractor, First Advantage.  The Court finds the discovery related to First Advantage to be particularly significant, because it confirmed that First Advantage would support PNC's theory that it was a mere "channeler" of FBI criminal history information, as opposed to a "consumer reporting agency," thereby creating a significant hurdle for Plaintiffs to overcome. *See* [ECF 66, pp. 13:8-14:9]; *c.f. Kidd*, 925 F.3d at 107; *Mix*, 2016 WL 5850362, at *4; *Martin*, 2014 WL 1260392, at *6.  This discovery was enough for the parties to fully assess their respective risks and the value of Plaintiffs' claims.

Because the parties completed substantial, key discovery prior to settlement, the Court finds that the third *Girsh* factor also favors approval.

**4.    Risks of Establishing Liability & Damages.**  The fourth and fifth *Girsh* factors "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  *In re Warfarin*, 391 F.3d at 537 (citations omitted). In other words, the Court must perform a cost-benefit analysis with respect to the risks and benefits of the parties litigating this case through class certification and trial.

Here, Plaintiffs faced an uphill battle to establish PNC's liability.  While still an open issue in the Third Circuit, several courts that have considered Plaintiffs' legal theory have found that an agency that simply channels FBI criminal-history information, as First Advantage claims to do, is not a "consumer reporting agency" covered by the FCRA.  *C.f. Kidd*, 925 F.3d at 107; *Mix*, 2016 WL 5850362, at *4; *Martin*, 2014 WL 1260392, at *6.  Assuming Plaintiffs could overcome that considerable hurdle, PNC realistically faced

30

total statutory-damages exposure in the range of $3,000,000.00 to $6,000,000.00.[1] But if Plaintiffs failed to present evidence that PNC's violation of the FCRA was "willful," those statutory damages would be unavailable, and Plaintiffs would be limited to their actual (and, for the most part, negligible) damages. In addition to severely curtailing Plaintiffs' damages overall, such a result could call class-certification into question by introducing individualized damages issues.

Plaintiffs' CHRIA claim was also in what Plaintiffs admit was "significant peril." [ECF 60, p. 8]. Specifically, PNC raised a facially compelling defense to that claim—namely, that it was required by federal law to check applicants' criminal history short of a conviction, and in some cases rescind job offers based on that history, because 12 U.S.C. § 1829(a)(1)(A) bars financial institutions from employing individuals who have entered into "pretrial diversion or a similar program" related to a "criminal offense involving dishonesty or a breach of trust or money laundering[.]"

Thus, the $600,000.00 settlement fund represents a 10-20% risk assessment of Plaintiffs' chances of ultimate success. This seems to be a reasonable, even generous, assessment of Plaintiffs' risk versus potential recovery. As a result, the fourth and fifth *Girsh* factors favor approval.

**5.    Risks of Maintaining Class-Action Status Through Trial.** The sixth *Girsh* factor "measures the likelihood of obtaining and

---

[1] The FCRA authorizes statutory damages between $100.00 and $1000.00 per violation. To reach this estimate, the Court assumes that a jury would award minimum or near-minimum statutory damages for at least the bulk of the violations here (*i.e.*, the perfunctory violations related to the "Claims Made" class). Of course, a jury could award more. But the Court finds it exceedingly unlikely that a properly instructed jury would be sufficiently outraged by technical notice violations to award significantly more than $100.00 per violation.

keeping a class certification if the action were to proceed to trial." *In re Warfarin*, 391 F.3d at 537. This risk remains a relevant consideration even after the Court has granted class certification, because "[a] district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id.* (citation omitted). Of course, credible threats to continued class certification have a "great impact on the range of recovery one can expect to reap from the action." *In re Gen. Motors*, 55 F.3d at 817.

Here, the Court has found class certification appropriate. Thus, it likely would have certified similar classes at trial, because "the standard for certification is the same for settlement classes as for conventional classes." *Id.* at 818. Furthermore, there are no specific threats to continued certification on the horizon—except that, as discussed, certification could be called into question before, or even after, trial if Plaintiffs failed to present evidence that PNC's conduct was "willful" and thus were limited to recovering their actual damages.

On balance, then, the sixth *Girsh* factor seems neutral or, since there is at least conceivable risk to continued certification should the case proceed, weighs slightly in favor of approving the settlement.

### 6. Defendants' Ability to Withstand a Greater Judgment.

The seventh *Girsh* factor "considers whether the defendant could withstand a judgment for an amount significantly greater than the proposed settlement." *Kapolka*, 2019 WL 5394751, at *6 (citation omitted). This factor comes into play where parties indicate that they have settled for a below-value amount because of concerns over the defendant's ability to pay, or where a court is concerned that a settlement is unduly small in light of the misconduct alleged and the defendant's demonstrable ability to pay much more. However, "a

defendant's ability or inability to withstand a greater judgment is irrelevant when the record includes no evidence related to the defendant's ability to pay an amount greater than the settlement, nor ... any indication that this factored into settlement negotiations." *Id.* (cleaned up); *see also Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 323 (3d Cir. 2011) ("[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment."); *In re Warfarin*, 391 F.3d at 538 ("The District Court found that this factor neither favored nor disfavored settlement because of a lack of evidence in the record about DuPont's ability to pay or whether such a consideration factored into the settlement negotiations. ... We see no error here.").

This is such a case. Undoubtedly, a financial institution the size of PNC could withstand a judgment far in excess of $600,000.00, or even far in excess of any statutory damages award Plaintiffs could reasonably expect to obtain after a total victory at trial. But PNC's ability to pay does not appear to have been a relevant factor in the parties' negotiations, and the Court does not have any concern that the settlement here is inadequate when considering the nature of Plaintiffs' allegations, Plaintiffs' maximum possible recovery, and the serious legal risks Plaintiffs face. Moreover, to the extent PNC engaged in "misconduct" for a judgment to deter (which PNC disputes), that aim appears to have been accomplished—as part of the settlement, PNC represents that it has changed its background-check policies to provide the pre-adverse action notice Plaintiffs sought.

For these reasons, the seventh *Girsh* factor also favors approval of the settlement.

      **7.**     **Reasonableness of Settlement.** The eighth and ninth *Girsh* factors collectively require the Court to broadly assess the

"reasonableness" of the settlement by "balancing Plaintiffs' best possible recovery against the risks of litigation." *Kapolka*, 2019 WL 5394751, at *6. "Ideally, this assessment should include comparing the value of damages that the plaintiffs would likely recover if successful, offset by the risk of not prevailing, with the amount of the proposed settlement." *Id.* (cleaned up). "But where calculating the best possible recovery for the plaintiffs is exceedingly speculative, the reasonableness of the settlement can be fairly judged by looking at the nature of the settlement itself and taking into consideration the risks of litigation." *Id.* (cleaned up).

Here, the parties' settlement is reasonable in both its amount and structure.  As discussed, the $600,000.00 settlement fund represents approximately 10-20% of the total amount Plaintiffs could expect to recover in statutory damages if they were to win a total victory at trial (*i.e.*, if they could establish both PNC's liability and its "willfulness").  This is a reasonable discount given the substantial legal challenges Plaintiffs would face in attempting to achieve that (perhaps unlikely) result, as well as the considerable time and effort they would expend to get to that point.  Indeed, Plaintiffs could receive far less money *even if* they prevail at trial, because statutory damages are only available if PNC's violations were "willful."

The proposed apportionment of this fund is also reasonable.  "Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable[.]"  *Sullivan*, 667 F.3d at 328 (cleaned up).  Additionally, "*pro rata* distributions of settlement funds are consistently upheld."  *Castro v. Sanofi Pasteur Inc.*, No. 11-7178, 2017 WL 4776626, at *7 (D.N.J. Oct. 23, 2017) (cleaned up).

Here, classes who suffered the most harm will receive the most money, and members of the class that suffered the greatest harm of all (the FCRA

34

"Rescinded" class) will each receive an amount in excess of their minimum statutory damages ($100.00). All payments will be applied *pro rata* within each class and, except for members of the minimally harmed "Claims Made" class, without the need to make any affirmative claim. Furthermore, at least 3000 individuals in the FCRA "Rescinded" and "Decisional" classes were given an opportunity to receive *additional* money by submitting a claim, given their overlap with the "Claims Made" class.

For these reasons, the Court finds that the eighth and ninth *Girsh* factors also favor approval of the settlement. That means all of *Girsh* factors favor approval, and so the Court concludes that the settlement is "fair, reasonable, and adequate" to protect the interests of all class members. The Court will grant Plaintiffs' motion to approve the settlement.

## III.   Plaintiffs' requested award of attorneys' fees is reasonable.

"Federal Rule of Civil Procedure 23(h) provides [that] in a certified class action, the court may award reasonable attorney's fees that are authorized by law or by the parties' agreement." *Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 496 (3d Cir. 2017) (cleaned up). However, a "thorough judicial review of fee applications is required in all class action settlements." *In re Prudential*, 148 F.3d at 333 (citation omitted). The aim of this review is to guard against "the danger that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees." *Id.* (cleaned up); *see also Horton*, 2020 WL 1952678, at *3 ("Courts are used to scrutinizing attorneys' fees in classwide settlements because of … the risks that the missing class members end up obtaining small benefits from a settlement compared to a large windfall reaped by class counsel.") (citation omitted); *cf. Vines v. Welspun Pipes, Inc.*, No. 18-509, 2020 WL 1910616, at *2 (E.D. Ark. Apr. 13, 2020) ("As is common, the Joint Motion to Approve provides:

'Attorneys' fees in this case were negotiated entirely separately from any negotiation of Plaintiffs' and opt-in Plaintiffs' settlement amount ....'  This statement is contradicted by the record.").

Here, Plaintiffs' counsel seek an award of $282,150.52 in attorneys' fees and $17,849.48 in costs—a total of $300,000.00.  An award of fees and costs "not to exceed" $300,000.00 is provided for in Sections 9.1.1 and 9.1.2 of the parties' settlement agreement.  This fee award is to be paid by Defendants separate and apart from the underlying settlement.  It will not be subtracted from the fund available to class members.  Moreover, the parties' settlement is "not conditioned on the Court's approval of [a]ttorneys' [f]ees in the requested amount or [any] amount whatsoever."  [ECF 51-1, § 9.1.2].  Counsel represents that the amount of attorneys' fees was negotiated separately during "a second day of mediation on May 8, 2019."  [ECF 60, p. 8].

"Attorneys' fees are typically assessed through the percentage-of-recovery method or through the lodestar method."  *In re AT & T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006) (citation omitted).  "The former applies a certain percentage to the settlement fund."  *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009) (cleaned up).  "The latter multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *Id.* (cleaned up).  In general, the "percentage-of-recovery" method is used to assess fees in "common fund" cases, while the "lodestar" method is more often used where fees are awarded pursuant to a fee-shifting statute.  *Id.*

The situation here is much more akin to a "common fund" case.  The "common fund" doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees."  *Id.* (cleaned up).  Here, the proposed fee

award is most naturally assessed as seeking a $300,000.00 (33.3%) cut of a $900,000.00 pot. *See Lake Forest Partners, L.P. v. Sprint Commc'ns Co. L.P.*, No. 12-999, 2013 WL 3048919, at *2 (W.D. Pa. June 17, 2013) (Schwab, J.) ("[I]t is appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class by the Settling Defendants' separate payment of attorney's fees and expenses, and the expenses of administration."); *Jackson v. Wells Fargo Bank, N.A.*, 136 F. Supp. 3d 687, 713 (W.D. Pa. 2015) ("These are sums that class members would otherwise be responsible for and therefore are part of the total benefit to the class.").

To decide if $300,000.00 is a reasonable percentage award of fees and costs, the Court must consider the *Gunter* and *Prudential* factors, "many of which are similar to the *Girsh* factors" discussed above. *In re AT & T Corp.*, 455 F.3d at 165. Those factors are: (1) the size of the fund created and the number of beneficiaries; (2) the presence or absence of substantial objections by members of the class to the settlement terms or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the time devoted to the case by plaintiffs' counsel; (7) the awards in similar cases; (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations; (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and; (10) any innovative terms of settlement. *See In re Diet Drugs*, 582 F.3d at 541; *see also Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000) (identifying factors 1-7*); In re Prudential Ins. Co.*, 148 F.3d at 338-40 (identifying factors 8-10).

These factors "need not be applied in a formulaic way" and "in certain cases, one factor may outweigh the rest." *In re AT & T Corp.*, 455 F.3d at 166 (citations omitted). "Courts in this Circuit also customarily cross-check the percentage award derived from these factors against the 'lodestar' award method, which is normally employed in statutory fee-award cases." *Kapolka*, 2019 WL 5394751, at \*7 (cleaned up).

A.   **The *Gunter* and *Prudential* factors favor approval of the attorneys' fee award.**

1.   **Size of the Fund Created; Number of Beneficiaries; Awards in Similar Cases.** The first *Gunter* factor requires the Court to look at the size of the fund created by the settlement agreement and the number of beneficiaries in the class. Relatedly, the seventh *Gunter* factor calls for the Court to compare the size of the proposed fee award to the size of awards in cases involving similar common funds. Both factors factor approval.

"Generally, the appropriate percentage awarded to class counsel decreases as the size of the fund increases." *Acevedo v. Brightview Landscapes, LLC*, No. 13-2529, 2017 WL 4354809, at \*17 (M.D. Pa. Oct. 2, 2017) (citation omitted). This rule-of-thumb is "premised on the belief that increases in recovery are usually the result of the size of the class and not a result of the efforts of counsel." *Id.* (citation omitted).

The parties' settlement agreement here establishes what amounts to a total "fund" of $900,000.00, of which $600,000.00 is allocated to class members and up to $300,000.00 is allocated to cover attorneys' fees and costs. This is, in effect, a 33.3% fee award. The total number of class-member beneficiaries is 29,318.

For this size fund, a percentage award of 33.3% falls squarely within the range of awards found to be reasonable by the courts. *See Vista Healthplan,*

*Inc.*, 2020 WL 1922902, at *28 ("Class Counsels' requested fees in this case represent 33 1/3 % of the total recovery, which is well within the range of reasonable fees, on a percentage basis, in the Third Circuit.").  Indeed, "fee awards ranging from thirty to forty-three percent have been awarded in cases with funds ranging from $400,000 to $6.5 million, funds which are comparatively smaller than many." *Erie Cty. Retirees Ass'n v. Cty. of Erie*, 192 F. Supp. 2d 369, 381 (W.D. Pa. 2002) (McLaughlin, J.) (citation omitted); *see also Martin*, 2008 WL 906472, at *5 ("District courts within the Third Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses, in settlements of this size."); *see, e.g.*:

| Case Name | Fund Size | Fee (%) |
|---|---|---|
| *Rouse v. Comcast Corp.,* No. 14-1115, 2015 WL 1725721 (E.D. Pa. Apr. 15, 2015) | $453,900.00 | 35% |
| *Ripley v. Sunoco, Inc.*, 287 F.R.D. 300 (E.D. Pa. 2012) | $675,000.00 | 33% |
| *Serrano v. Sterling Testing Sys., Inc.,* 711 F. Supp. 2d 402 (E.D. Pa. 2010) | $987,000.00 | 33.1% |
| *Smith v. Dominion Bridge Corp.,* No. 96-7580, 2007 WL 1101272 (E.D. Pa. Apr. 11, 2007) | $750,000.00 | 33.3% |
| *Stoner v. CBA Info. Servs.*, 352 F. Supp. 2d 549 (E.D. Pa. 2005) | $772,500.00 | 33% |
| *In re Valuevision Int'l Inc. Sec. Litig.,* 957 F. Supp. 699 (E.D. Pa. 1997) | $926,136.99 | 34.27% |

**2.    Substantial Objections by Class Members.**    As discussed, there have been no objections to any aspect of the settlement agreement, including to the attorneys' fees award.  "Such an absence favors awarding the requested fees without reduction." *Rouse v. Comcast Corp.*, No. 14-1115, 2015 WL 1725721, at *12 (E.D. Pa. Apr. 15, 2015) (citation omitted). Thus, the second *Gunter* factor favors approval.

**3.**    **Skill and Efficiency of Attorneys Involved.**    As discussed, Plaintiffs' counsel are experienced class litigators who have served as lead counsel in many class action lawsuits, including FCRA class actions. *See, e.g. Campos*, 237 F.R.D. 478; *Gillespie*, 484 F.3d 938; *Reardon*, 2011 WL 1628041, at *1.  The third *Gunter* factor weighs in favor of approval.

**4.**    **Complexity and Duration of Litigation.**    The fourth *Gunter* factor overlaps completely with the identical first *Girsh* factor.  As discussed in connection with that factor, this case, though not particularly complex, is still far from trial ready.  Thus, by negotiating an early settlement, Plaintiffs' counsel achieved a positive result for class members that avoided protracted litigation in which victory was far from certain.  This factor favors approval of the requested fee award.

**5.**    **Risk of Nonpayment.**    The fifth *Gunter* factor considers how much risk Plaintiffs' counsel assumed by prosecuting their case with no guarantee of recovery.  *See, e.g., Brumley v. Camin Cargo Control, Inc.*, No. 08-1798, 2012 WL 1019337, at *11 (D.N.J. Mar. 26, 2012) ("The Court also finds that Plaintiffs' counsel risked non-payment during the period of their representation since they represented Plaintiffs entirely on a contingent basis[.] ... Given these considerations, the Court finds that the risk of non-payment weighs in favor of the requested fee.").

This factor is neutral or weighs only slightly in favor of approval.  While Plaintiffs' counsel certainly took on some degree of risk, experienced class-action litigators should be able to quickly assess the merits of a claim like this—based in large part on standardized policies that allegedly violate technical, statutory notice requirements—and reach a resolution with opposing counsel relatively quickly.  Moreover, as discussed, PNC's ability to pay any appropriate settlement was never in doubt.  Thus, to some extent, any

contingency risk assumed by counsel is illusory here.  However, if there was some real risk of non-payment, then this factor slightly favors approval.

      **6.**     **Amount of Time Devoted by Plaintiffs' Counsel.** Plaintiffs' counsel's records suggest that they have devoted 970.6 attorney and paralegal hours to work associated with this action over a period of three years. This is a substantial expenditure of time and effort that weighs in favor of a significant fee award, or at least a fee award consistent with the norm. *See, e.g., Rouse*, No. 14-1115, 2015 WL 1725721, at \*13 (concluding that "the time devoted to this case was significant" where counsel devoted 221.45 hours to case).  As a result, the final *Gunter* factor favors approval.

      **7.**     **Value of Benefits Attributable to Class Counsel Relative to Other Groups.**  The first *Prudential* factor is typically relevant in cases where a class-action lawsuit follows an investigation by a government agency or other third-party who, in effect, did some portion of counsel's work for them.  In other words, if Plaintiffs' counsel is merely piggy backing off the work of some other entity to win a benefit for the class, it is logical that a smaller fee award might be appropriate.  Here, however, all benefits obtained by Plaintiffs through the proposed settlement can be "attributed to the efforts of counsel, rather than to government agencies or other groups." *Kapolka*, 2019 WL 5394751, at \*10.  As a result, this factor favors approval of counsel's fees without any reduction to account for work done by "other groups."

      **8.**     **Percentage Fee if Subject to Private Fee Arrangement.**  In private contingency fee cases, "plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."  *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (citations omitted); *see Craig v. Rite Aid Corp.,* No. 08-2317, 2013 WL 84928, at \*12 (M.D. Pa. Jan. 7, 2013) ("In this region, '[a]ttorneys regularly contract

for contingent fees between 30% and 40% with their clients in non-class, commercial litigation' and thus we have no trouble finding that an award of thirty-two percent (32%) less expenses, which falls at the low end of that range, is consistent with market rates."). A percentage fee of 33.3% falls in the middle of that range, so the second *Prudential* factor favors approval of the fee award.

        **9.**    **Innovative Terms of Settlement.**    The Court has reviewed the parties' proposed settlement agreement and has identified no unusual or "innovative" terms requiring further analysis.    Thus, the final *Prudential* factor favors approval.

        Because all the *Gunter* and *Prudential* factors are either neutral or weigh in favor of approval, the Court will grant Plaintiffs' motion and award counsel's requested fees and costs.    While the Court would usually perform a lodestar "cross-check" to confirm the reasonableness of the award, it finds that a cross-check is not required, and not particularly useful, in this case.  *See Moore v. GMAC Mortg.*, No. 07-4296, 2014 WL 12538188, at *2 (E.D. Pa. Sept. 19, 2014) ("The lodestar cross-check is 'suggested,' but not mandatory."); *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 94 (D.N.J. 2001) ("*Cendant* stated that the use of the lodestar cross check is not mandatory in determining the reasonableness of a fee award.").  That is because the lodestar analysis aims to "ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001).  Here, Plaintiffs' proffered "lodestar" ($586,920.00) is much higher than the amount of fees Plaintiffs will obtain under the percentage-of-recovery analysis ($282,150.52).  Thus, there appears to be no danger that a 33.3% percentage fee award will result in counsel

reaping an undue "windfall" when compared to actual hours worked, even if the Court were to reduce counsel's lodestar calculation by half.[2]

---

[2] While Plaintiffs' counsel's requested percentage fee is a reasonable award under the circumstances, the record would likely not justify a greater recovery based on the lodestar amount, had Plaintiffs' counsel requested it (which they reasonably did not). Specifically, the Court has some concerns that Plaintiffs' proffered lodestar appears to be inflated by hourly-fee rates that would be difficult to justify under a full-blown lodestar analysis.

As just one example, counsel's lodestar calculation includes 691.25 hours billed by Plaintiffs' most senior counsel at a rate of $725.00 per hour. "In an attorney's fee award, the proper hourly fee rate is determined by the community market rate rule." *L.J. ex rel. V.J. v. Audubon Bd. of Educ.*, 373 F. App'x 294, 296 (3d Cir. 2010). Even for experienced class-action counsel, this rate seems high. For example, a recent consumer-law attorney survey indicates that the median hourly rate for "Attorneys Handling Class Action Cases" in this region is $400.00 per hour. *See* Burdge, R., *United States Consumer Law Attorney Fee Survey Report, 2017-2018*, available at https://burdgelaw.com/wp-content/uploads/2019/10/US-Consumer-Law-Attorney-Fee-Survey-Report-2017-2018.pdf (last accessed June 24, 2020). The same survey suggests that even the most experienced consumer-law attorneys in this region (those with 41+ years of experience) average only $600.00 per hour. Counsel avers that he has approximately 30 years of consumer-law experience, which would suggest that an appropriate hourly rate for a senior class-action plaintiffs' attorney in this region might be something more akin to $350.00 and $400.00 per hour. *See id*.

Notably, Plaintiffs do not present evidence of counsel being compensated at a $725.00 per hour rate by any paying client. *Cf. Dillard v. City of Greensboro*, 213 F.3d 1347, 1354–55 (11th Cir. 2000) ("What Still charges clients is powerful, and perhaps the best, evidence of his market rate[.]").

It also seems that much of the work performed by lead counsel, at his $725.00 hourly rate, involved tasks more suited to inexperienced attorneys or paralegals, billing at lower hourly rates. *Cf. Middlebrooks v. Teva Pharm. USA, Inc.*, No. 17-412, 2019 WL 936645, at *7 (E.D. Pa. Feb. 26, 2019) ("[S]he provides no detail regarding how much time she spent on those tasks and includes tasks more junior attorneys or law clerks could have performed[.]"). Indeed, Plaintiffs' lead counsel personally billed 691.25 (71%) of the total hours billed by his firm. That seems to necessarily include a substantial amount of work related to tasks suitable for less senior attorneys (*i.e.*, discovery tasks,

**CONCLUSION**

For the reasons discussed above, the Court will certify the proposed settlement classes and grant Plaintiffs' motions. Specifically, the Court finds that the settlement classes satisfy the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3), that the parties' settlement agreement is fair, reasonable, and adequate, and that the requested award of attorneys' fees and costs is reasonable based on a percentage-of-recovery analysis.

A corresponding order follows.

DATE: June 26, 2020                                   BY THE COURT:

                                                     /s/ *J. Nicholas Ranjan*
                                                     United States District Judge

---

research regarding "class certification viability," drafting "mediation statements"). [ECF 61-3; ECF 61-7]. Work of this kind accounts for 820.6 (84%) of the total hours billed by counsel's firm. [*Id.*].

Given this, if the lodestar mattered here, the Court is a bit skeptical that a $725.00 hourly rate could be justified, at least without a stronger evidentiary record to support it. "Courts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded." *Am. Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). That is true even where a fee petition is nominally "unopposed" due to settlement.

For these reasons, in approving Plaintiffs' counsel's 33.3% fee award, the Court relies on the fact that the percentage-of-recovery approach is the appropriate route in cases like this and makes no finding as to the reasonableness of counsel's asserted hourly rates. If a lodestar analysis, or even a cross-check, were required here (which it is not), the Court would probably require the submission of more detailed billing records and market-rate evidence to support the requested fees.